## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MYRNA MYERS and JAMES MYERS | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 21-11500 |
| | ) | |
| v. | ) | **COMPLAINT AND JURY TRIAL** |
| | ) | **DEMANDED** |
| KONINKLIJKE PHILIPS N.V., PHILIPS | ) | |
| NORTH AMERICA LLC, PHILIPS | ) | |
| HOLDING USA, INC., PHILIPS RS | ) | |
| NORTH AMERICA LLC, and JOHN | ) | |
| DOEs 1-20 | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Myrna Myers and James Myers ("Plaintiffs"), by and through their undersigned counsel, hereby submit the following Complaint and Demand for Jury Trial against Defendants Koninklijke Philips N.V. ("Philips NV"), Philips North America LLC ("Philips NA"), Philips Holding USA, Inc. ("Philips Holding"), Philips RS North America LLC ("Philips RS"), and John Does 1-20 (collectively, "Philips" or "Defendants") and alleges the following upon information and belief:

### <u>NATURE OF THE ACTION</u>

1.     Philips researches, develops, designs, manufactures, sells, distributes, and markets a variety of Bilevel Positive Airway Pressure ("BiPAP") and Continuous Positive Airway Pressure ("CPAP") devices, which are used to treat obstructive sleep apnea ("OSA"), and a variety of mechanical ventilators ("ventilators"), which are used to treat respiratory failure.

2.     On June 14, 2021, Philips announced a major recall of millions of BiPAP and CPAP devices and ventilators (collectively, "the recalled devices") and first notified the public of

Potential, serious health risks caused by polyester-based polyurethane sound abatement foam ("PE-PUR foam") used in the design and manufacture of the recalled devices.

3.    Philips notified the public that the PE-PUR foam could degrade, break down, and release toxic particulates and volatile organic compounds ("VOSS") into the air pathway of the recalled devices, which a device user could inhale or ingest and suffer toxic or carcinogenic effects.

4.    On July 22, 2021, the United States Food and Drug Administration ("FDA") classified the subject recall as Class I, the most serious type of recall, which indicates that use of the recalled devices may cause serious injuries or death.

5.    Philips knew or should have known about these potentially life-threatening health risks prior to the recall, but did nothing to warn patients or their physicians.

6.    Plaintiff was prescribed, purchased, and used on a daily basis, for numerous years, two of the recalled devices for OSA treatment:  a Philips System One RemStar Auto CPAP with A-Flex ("System One") [Serial No. P15038037AB96] and later, a Philips DreamStation Auto CPAP ("DreamStation") [Serial No. J264229850E6E] (collectively, "the subject devices").

7.    As a direct and proximate result of Philips's wrongful conduct in researching, developing, designing, manufacturing, selling, distributing, and marketing the subject devices, and in failing to warn consumers and the medical community regarding their latent and foreseeable risks, Plaintiff developed chronic lymphocytic leukemia/small lymphocytic lymphoma, a severe and life-altering injury.

## PARTY PLAINTIFF

8.      At all relevant times, including the times Plaintiff was prescribed, purchased, and used the subject devices, Plaintiff has been a United States citizen and resident of Lorton, Virginia.

9.      Plaintiff began using a CPAP machine for the treatment of OSA in approximately 2010 with a prescription provided by Dr. Brown of Munson Army Health Center in Fort Leavenworth, Kansas, while she was a stationed there for her military service.  Plaintiff received and began using the defendants' A-Flex ("System One") CPAP device in approximately 2014 and later defendants' Philips DreamStation Auto CPAP.

10.     At all relevant times, Plaintiff used the subject devices for the purpose for which they were researched, developed, designed, manufactured, sold, distributed, marketed and otherwise intended for.

11.     As a result of using the subject devices, Plaintiff was exposed to toxic and harmful substances and suffered severe personal injuries that would not have occurred but for the defective nature of the subject devices and Philips's failure to warn Plaintiff or her physicians of the serious health risks associated with use of the subject devices.

## PARTY DEFENDANTS

12.     Philips NV is a public limited liability company established under the laws of the Kingdom of the Netherlands, having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, Netherlands.

13.     Philips NV researches, develops, designs, manufactures, sells, distributes, and markets BiPAP/CPAP and ventilator devices, including the recalled devices and subject devices.

14.     Philips NV researched, developed, designed, manufactured, sold, distributed, and marketed the recalled devices, including the subject devices.

15.     Philips NV is the parent company of Philips NA and Philips RS.

16.     Philips NA is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.

17.     Philips NA is a wholly-owned subsidiary of Philips NV.

18.     Upon information and belief, Philips NA manages the operations of Philips NV's lines of business in North America, including Philips RS.

19.     Philips NA researches, develops, designs, manufactures, sells, distributes, and markets BiPAP/CPAP and ventilator devices, including the recalled devices and subject devices.

20.     Philips NA researched, developed, designed, manufactured, sold, distributed, and marketed the recalled devices, including the subject devices.

21.     Philips Holding is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.

22.     Philips Holding is a holding company and the sole member of Philips NA.

23.     Philips Holding researches, develops, designs, manufactures, sells, distributes, and markets BiPAP/CPAP and ventilator devices, including the recalled and the subject devices.

24.     Philips Holding researched, developed, designed, manufactured, sold, distributed, and marketed the recalled devices, including the subject devices.

25.     Philips RS is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206.

26.     Prior to December 2020, Philips RS operated under the name Respironics, Inc. ("Respironics"), which Philips NV acquired in 2008.

27.     Philips RS researches, develops, designs, manufactures, sells distributes, and markets BiPAP and CPAP devices and ventilators, including the recalled devices and subject devices.

28.     Philips RS researched, developed, designed, manufactured, sold, distributed, and marketed the recalled devices, including the subject devices.

29.     Upon information and belief, Defendants John Does 1-20 (fictitious names) are entities and/or persons who are liable to Plaintiff, but who have not yet been identified despite reasonable due diligence on the part of Plaintiff.

30.     Upon information and belief, Defendants John Does 1-20 research, develop, design, manufacture, sell, distribute, and market BiPAP and CPAP devices and ventilators, including the recalled devices and subject devices.

31.     Upon information and belief, Defendants John Does 1-20, researched, developed, designed, manufactured, sold, distributed, and promoted the recalled devices, including the subject devices.

32.     At all relevant times, Defendants were and are in the business of researching, developing, designing, manufacturing, selling, distributing, and marketing devices for the treatment of OSA and respiratory failure, including the recalled devices and subject devices.

33.     At all relevant times, Defendants acted in concert in researching, developing, designing, manufacturing, selling, distributing, and marketing devices for the treatment of OSA and respiratory failure, including the recalled devices and subject devices.

34.     At all relevant times, Defendants combined their property and labor in a joint undertaking for profit in the researching, developing, designing, manufacturing, selling,

distributing, and marketing of devices for the treatment of OSA and respiratory failure, including the recalled devices and subject devices, with rights of mutual control over each other.

35.     At all relevant times, Defendants operated as a single enterprise, equally controlled each other's business affairs, commingled their assets and funds, disregarded corporate formalities, and used each other as corporate shields.

36.     At all relevant times, Defendants were mere alter egos or instrumentalities of each other; there is such a unity of interest and ownership between Defendants that the separate personalities of their respective entities ceased to exist.

37.     At all relevant times, Defendants acted in all respects as agents or apparent agents of one another and, as such, are jointly liable to Plaintiff.

## JURISDICTION AND VENUE

38.     This Court has diversity subject matter jurisdiction under 28 U.S.C. §1332, because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00.

39.     Specifically, as alleged herein, Plaintiff is a citizen of Virginia and Defendants are citizens of:  the Kingdom of the Netherlands and the States of Delaware, Massachusetts, and Pennsylvania.

40.     Additionally, the damages Plaintiff sustained as a result of Defendants' researching, developing, designing, manufacturing, selling, distributing, and marketing of the subject devices, and failure to warn of their serious and life-threatening risks, substantially exceed $75,000.00.

41.     This Court has specific personal jurisdiction over Defendants, because Defendants regularly transact business in Massachusetts by engaging in the researching, developing,

designing, manufacturing, selling, distributing, and marketing of, amongst other products, BiPAP/CPAP and ventilator devices, including the subject devices, in Massachusetts.

42.     Furthermore, Defendants derive substantial revenue from their business transactions in Massachusetts and have purposely availed themselves of the privilege of doing business in Massachusetts.

43.     Moreover, Philips NA and Philips Holding maintain their principal places of business in Massachusetts.

44.     Accordingly, Defendants reasonably anticipated and/or should have reasonably anticipated being subjected to specific personal jurisdiction in this state as a result of their actions in researching, developing, designing, manufacturing, selling, distributing, and marketing amongst other products, the recalled devices, including the subject devices, in Massachusetts.

45.     Defendants have sufficient minimum contacts with Massachusetts such that subjecting them to specific personal jurisdiction in this state does not offend traditional notions of fair play and substantial justice and comports with due process.

46.     Venue in this Court is proper because Philips NA and Philips Holding are headquartered and regularly conduct business in this District and because a substantial part of the events and omissions giving rise to the claim occurred in this District.

<u>**FACTUAL ALLEGATIONS**</u>

**A. Background on Positive Airway Pressure Devices and Mechanical Ventilators.**

47.     BiPAP and CPAP devices, as well as mechanical ventilators, are medical devices designed to help patients breathe.

48.     BiPAP and CPAP devices are types of positive airway pressure ("PAP") devices typically used to treat OSA.

49.     OSA is a breathing disorder characterized by repeating episodes of breathing cessation due to upper airway collapse during sleep.  The episodes of breathing cessation are called "apneas," which can result in snoring, daytime sleepiness, and fatigue, but also increased risk of severe cardiovascular conditions, such as coronary artery disease, congestive heart failure, stroke, and sudden cardiac death.

50.     CPAP devices work by delivering a continuous stream of filtered and pressurized air into a patient's airway, using a motor to draw room-temperature air through a filter and force the filtered air into a flexible tube attached to a mask covering the patient's nose or mouth.  The continuous stream of filtered and pressurized air holds the airway open and prevents it from collapsing during sleep.

51.     BiPAP devices are a common alternative to CPAP devices, and use two different pressures to hold the airway open during inhalation and exhalation.

52.     Patients who use PAP devices to treat OSA typically use them every night while sleeping.

53.     Ventilators are medical devices that take on the work of breathing when a patient suffers respiratory failure or is unable to breathe enough on their own, such as during surgery.

54.     Respiratory failure is a serious condition that develops when the lungs cannot get enough oxygen into the blood resulting in a buildup of carbon dioxide that can damage tissues and organs and further impair oxygenation of the blood.  Many underlying conditions can cause respiratory failure, such as physical trauma, pneumonia, sepsis, drug overdose, or COVID-19.  If not treated appropriately, respiratory failure can lead to death.

55.     Ventilators work by applying positive pressure to the airway through an endotracheal tube, tracheostomy tube, or breathing mask, and blows air into the lungs.  Patients usually exhale the air on their own, but sometimes the ventilator does it for them.

56.     Some patients require ventilators for short periods of times, such as during surgery and under anesthesia, while other patients must use ventilators for longer periods of time or even the rest of their lives.

## B. Rapid Growth of the OSA Treatment Industry.

57.     OSA treatment is a multi-billion-dollar global industry dominated by the North American market, specifically the United States.  In 2020, the global OSA device market was valued at $3.7 billion; the North American market accounted for a revenue share of 49.0%.[1] Moreover, within the North American market, the United States alone accounted for a revenue share of 91%.[2]

58.     Likewise, the ventilator market represents another multi-billion-dollar industry. In 2020, the global ventilator market size was valued at $7.2 billion and is expected to grow at a compound annual rate of 4.9% from 2021 to 2028.  North America dominates the ventilator market as well, accounting for a revenue share of 60% in 2020.[3]

---

[1] Sleep Apnea Devices Market Size, Share & Trends Analysis Report By Product Type (Diagnostic Devices, Therapeutic Devices, Sleep Apnea Masks), By Region (North America, Europe, APAC, Latin America, MEA), And Segment Forecasts, 2021 – 2028, https://www.grandviewresearch.com/industry-analysis/sleep-apnea-devices-market (last accessed September 2, 2021).
[2] Sleep Apnea Devices Market Size By Product (Therapeutics {Airway Clearance System, Adaptive Servo-ventilation {ASV}, Positive Airway Pressure {PAP} Device, Oral Appliances, Oxygen Devices}, Diagnostics {Actigraphy Systems, Polysomnography {PSG} Device, Respiratory Polygraph, Sleep Screening Devices}), By End-use (Home Care Settings & Individuals, Sleep Laboratories & Hospitals), COVID19 Impact Analysis, Regional Outlook, Application Potential, Price Trends, Competitive Market Share & Forecast, 2021 – 2027, https://www.gminsights.com/industry-analysis/sleep-apnea-devices-market-report (last accessed September 2, 2021).
[3] Mechanical Ventilator Market Size, Share & Trends Analysis Report, By Product (Critical care, Neonatal, Transport and Portable), By Region (North America, Europe, APAC, Latin America, MEA), And Segment

59. Philips is a major manufacturer of PAP devices and ventilators, among other products. According to Philips's 2020 Annual Report, "Sleep & Respiratory Care" constituted approximately 49% of Philips's total sales in its Connected Care line of business, which accounted for 28% of Philips's overall sales of about €19.535 billion ($23.735 billion).[4][5]

60. The basic technology used in PAP devices today was originally developed in 1980 by an Australian pulmonologist, Dr. Colin Sullivan, who first used it to treat dogs with respiratory problems before the technology was adapted to humans.

61. Respirators commercialized this technology and sold the first publicly available CPAP device in 1985. ResMed, an industry competitor, followed with the release of its own CPAP device in 1989.

62. These first-generation PAP devices created a new and commercially viable field of respiratory therapy. However, the devices themselves were large and noisy, resulting in an "arms-race" between competing manufacturers to develop devices that were smaller, more responsive to patient breathing patterns, and, most importantly, quieter.

63. The noise level of PAP devices became a driver of adult consumer preference, because loud devices interrupt the peaceful sleep of both the patient and their partner, making it less likely the patient will use the device regularly.

64. The issue of noise is also a particular problem in neonatal intensive care units where infants may remain on ventilators or PAP devices for long periods of time. As a result, hospitals prefer quieter devices to protect the hearing of the infants on these devices.

---

Forecasts, 2021 – 2028. https://grandviewresearch.com/industry-analysis/mechanical-ventilators-market (last accessed September 2, 2021).
[4] U.S. dollar equivalence is based on the average EUR/USD exchange rate on January 25, 2021 when Philips announced its 2020 Fourth Quarter and Annual results (1 EUR = 1.215 USD).
[5] PHILIPS, ANNUAL REPORTS 2020 (2021).

65.     Determined to develop the quietest devices on the market with the lowest possible decibel rating, device manufacturers, such as Philips, filled PAP and ventilator devices with sound abating foam to reduce the noise emitted from the motor and airflow.

66.     Since 2009, Philips has incorporated PE-PUR foam in its PAP devices and ventilators, including the subject devices, for sound abatement purposes.

67.     However, PE-PUR foam can degrade into particles and off-gas certain chemicals. This process is exacerbated by environmental factors, such as heat or humidity.

68.     The particulates and off-gas chemicals resulting from the degradation of PE-PUR foam are toxic and cause both short-term and long-term health risks.

69.     Nevertheless, owing to the design of Philips's PAP devices and ventilators, including the subject devices, air passes through potentially degraded PE-PUR foam before it is pumped into the patient's airway, thus exposing users to these toxins.

**C. FDA 510(k) Clearance Process.**

70.     For decades, medical device manufacturers, including Philips, have used the 510(k)-clearance process to market PAP devices and ventilators in the United States.

71.     The 510(k)-clearance process refers to Section 510(k) of the Medical Device Amendments of 1976 ("MDA") of the Federal Food, Drug and Cosmetic Act.

72.     Under this process, device manufacturers are only required to notify FDA at least ninety (90) days before marketing a device claimed to be "substantially equivalent" to a device FDA approved for sale prior to 1976, when the MDA was enacted.

73.     Under Section 510(k) of the Federal Food, Drug and Cosmetic Act, a medical device does not have to go through the rigors of a clinical study to gain approval by FDA.

74.     Subsequent amendments to the MDA allowed for 510(k) clearance of products deemed "substantially equivalent" to post-MDA 510(k) cleared devices.

75.     Through this domino effect, medical devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices approved for sale by FDA prior to 1976 could be sold to patients in a matter of ninety (90) days without any clinical testing demonstrating the device's efficacy or safety.

76.     Clearance for sale under the 510(k) process does not equate to "FDA approval" of the cleared device.

77.     In 2012, at the request of FDA, National Institute of Health ("NIH") conducted a thorough review of the 510(k) process, coming to the major conclusion that this process was not intended to ensure the safety of medical devices, stating:

> The 510(k)-clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions.  The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.[6]

78.     NIH explained, "[t]he assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'"[7]

79.     Further, the NIH pointed out that the classification of predicate devices approved for sale prior to the 1976 MDA "did not include any evaluation of the safety and effectiveness of individual medial devices . . .[t]hus, it is common for devices that were never individually

---

[6] Institute of Medicine (U.S.).  Committee on the Public Health Effectiveness of the FDA 510(k) Clearance Process, Medical Devices and the Public's Health 189 (Institute of Medicine, 2011).
[7] *Id*. At 6.

evaluated for safety and effectiveness, either through the original device classification program

or through the 510(k) process."[8]

80.    Philips utilized the 510(k)-clearance process for the recalled devices, including

the subject devices.

81.    Philips's System One received 510(k) clearance on January 29, 2002.

82.    Philips's DreamStation received 510(k) clearance on October 18, 2013.

**D. Life- Threatening Risks Result in a Massive Recall.**

83.    On April 13, 2021, Philips announced the launch of the DreamStation 2, the latest

generation of Philips's flagship BiPAP/CPAP product family known as the "DreamStation."

84.    Less than two weeks later, on April 26, 2021, Philips released its 2021 Q1

Quarterly Report, which included a regulatory update that warned its investors of "possible risks

to users related to the sound abatement foam used in certain of Philips's sleep and respiratory

care devices currently in use."  The update nevertheless assured shareholders that Philips's

upcoming and latest generation device, DreamStation 2, was not affected.[9]

85.    On June 14, 2021, Philips announced an official world-wide recall of certain

BiPAP and CPAP devices and ventilators that incorporated PE-PUR foam and pose life-

threatening health risks to users:

> To date, Philips has produced millions of BiLevel PAP, CPAP and
> mechanical ventilator devices using the PE-PUR sound abatement
> foam.  Despite a low complaint rate (0.03% in 2020), Philips
> determined based on testing that there are possible risks to users
> related to this type of foam.  The risks include that the PE-PUR
> foam may degrade into particles which may enter the device's air
> pathway and be ingested or inhaled by the user, and the foam may
> off-gas certain chemicals.  The foam degradation may be
> exacerbated by use of unapproved cleaning methods, such as

---

[8] *Id*. At 5.
[9] PHILIPS, Q1 2021 QUARTERLY REPORT (2021).

ozone, [**] and high heat and high humidity environments may also contribute to foam degradation.

Therefore, Philips has decided to voluntarily issue a recall notification [*] to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken.[10]

86.     The recall notification identified the following devices, including the subject

devices, as affected by the recall:

    a.     **CPAP and BiPAP Devices:**

Continuous Ventilator, Non-life Supporting
1.     DreamStation ASV;
2.     DreamStation ST, AVAPS;
3.     SystemOne ASV4;
4.     C-Series ASV, S/T, AVAPS;
5.     OmniLab Advanced+;

Non-continuous Ventilator
6.     SystemOne Q series;
7.     DreamStation CPAP, AutoCPAP, BiPAP;
8.     DreamStation Go CPAP, APAP;
9.     Dorma 400, 500 CPAP;
10.    REMStar SE AutoCPAP;

Continuous Ventilator, Minimum Ventilatory Support, Facility Use Device:
11.    E30.[11]

    b.     **Ventilators:**

Continuous Ventilator
1.     Trilogy 100;
2.     Trilogy 200;
3.     Carbone Plus, Aeris, LifeVent Ventilator;

Continuous Ventilator, Minimum Ventilatory Support, Facility Use

---

[10] Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices, https:www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abetement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last visited Sept. 9, 2021).

[11] The E30 ventilator did not receive 510(k)-clearance, but rather FDA Emergency Use Authorization as a result of the COVID-19 pandemic.

      4.        A-Series BiPAP Hybrid A30;

      5.        A-Series BiPAP V30 Auto;

      Continuous Ventilator, Non-life Supporting

      6.        A-Series BiPAP A40;

      7.        A-Series BiPAP A30;

87.     The recall notification further admitted that degradation of the PE-PUR foam in the recalled devices exposes users to toxic and carcinogenic foam particulates and VOC emissions and poses the following critical safety risks:

> The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects.[12]

88.     On the same date, Philips further issued a separate notice directed to health care providers, which warned that PE-PUR foam degradation "could result in a wide range of potential patient impact," including "serious injury which can be life-threatening," "permanent impairment," or "require medical intervention to preclude permanent impairment."[13] The notice to health care providers detailed two types of health hazards arising from PE-PUR foam degradation: ingestion or inhalation of toxic particulates and VOCs.

89.     Philips disclosed that it "received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)," which a user might ingest or inhale and that lab analysis revealed that even before the particulates appear, the degraded foam may generate harmful chemicals:

> Potential Hazard: Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into

---

[12] Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices, *supra* note 5.

[13] Sleep and Respiratory Care update Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/global-corporate/philips-clinical-information-for-physicians-and-providers.pdf (last visited Sept. 9, 2021).

particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP).  BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices.  The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions.  Unauthorized cleaning methods such as ozone may accelerate potential degradation.

The absence of visible particles does not mean that foam breakdown has not already begun.  Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:

Toluene Diamine

Toluene Diisocyanate

Diethylene glycol[14]

90.    Toluene diamine ("TDA") is classified by United States Environmental Protection Agency ("EPA") as a probable human carcinogen.[15]  The EPA also determined that acute exposure to TDA can produce severe skin and eye irritation, sometimes leading to permanent blindness, respiratory problems (e.g., asthma), rise in blood pressure, dizziness, convulsions, fainting, and coma.

91.    Toluene diisocyanate ("TDI") is considered by National Institute for Occupational Safety and Health ("NIOSH") to be a potential human carcinogen.[16]

92.    Diethylene glycol (DEG) is a widely used solvent, but there is limited information about its toxicity in humans, despite its historical involvement in mass poisonings around the world.  Famously, DEG caused the death of one-hundred (100) people across fifteen

---

[14] *Id.*
[15] Toluene-2, 4-Diamine, United States Environmental Protection Agency (January 2000), https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4diamine.pdf
[16] Centers for Disease Control and Prevention, The National Institute of Occupational Safety and Health (NIOSH), https://www.cdc.gov/niosh/npg/npgd0621.html (last visited Sept. 9, 2021).

(15) states in the 1937 Elixir Sulfanilamide Incident, which served as a catalyst for the enactment of the Federal Food, Drug, and Cosmetic Act in 1938.[17]

93.    Philips also explained that testing confirmed the presence of several harmful organic compounds that may off-gas from the degraded foam and cause adverse health effects:

> Potential Hazard:  Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s).  VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds.  The compounds identified are the following:
>
> -    Dimethyl Diazene
>
> -    Phenol, 2, 6-bis (1, 1-dimethylethyl)-4-(1-methylpropyl)[18]

94.    Philips admitted that these VOCs "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve," may cause "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects," and may cause "adverse effects to other organs such as kidney and liver."

95.    Also, on June 14, 2021, Philips's main competitor, ResMed, issued "[a] message from ResMed's CEO" to the public regarding the Philips recall.  In this notice, ResMed CEO, Mick Farrell, stated that "ResMed devices are safe to use and are not subject to Philips' recall. ResMed devices use a different material than what Philips uses in their recalled machines."[19]

---

[17] Sulfanilamide Disaster, U.S. Food & Drug Administration, FDA Consumer Magazine (June 1981), https://www.fda.gov/files/about%20fda/published/The -Sulfanilamide-Disaster.pdf
[18] Id.
[19] Information regarding Philips' recall, https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last visited Sept. 9, 2021).

96.     ResMed PAP devices and ventilators, in fact, use polyether urethane ("PEUR") or silicone-based foam for sound abatement purposes, not PE-PUR foam.

97.     On June 30, 2021, FDA issued a Safety Communication alerting the public of the recall and the potential health risks from the PE-PUR sound abatement foam:

> The polyester-based polyurethane (PE-PUR) sound abatement foam, which is used to reduce sound and vibration in these affected devices, may break down and potentially enter the device's air pathway.  If this occurs, black debris from the foam or certain chemicals released into the device's air pathway may be inhaled or swallowed by the person using the device.[20]

98.     On July 29, 2021, FDA classified the Philips recall as a Class I recall, the most serious type of recall, which indicates that use of the recalled devices may cause serious injury or death resulting from the inhalation or ingestion of PE-PUR foam particles and off-gassed chemicals.[21]

### E. Philips Knew the Risks but Failed to Protect Consumers.

99.     Philips knew about the potential health risks from its PAP devices related to PE-PUR foam degradation well before notifying the public on June 14, 2021.

100.    Upon information and belief, Philips knew about the possibility of PE-PUR foam degradation since it began using this particular foam in its PAP devices.

101.    Upon information and belief, Philips knew of the risk that degraded PE-PUR foam could produce toxic and carcinogenic particulates and VOC gas emissions.

---

[20] Philips Respironics CPAP, BiPAP, and Ventilator Recall:  Frequently Asked Questions, https://www.fda.gov/medical-devices/safety-communications/philips-respironics-cpap-bipap-and-ventilator-recall-frequently-asked-questions (last visited Sept. 9, 2021).
[21] Certain Philips Respironics Ventilators, BiPAP, and CPAP Machines Recalled Due to Potential Health Risks: FDA Safety Communication, https://www.fda.gov/medical-devices/safety-communications/certain-philips-respironics-ventilators-bipap-and-cpap -machines-recalled-due-potential-health-risks (last visited Sept. 9, 2021).

102.     As adverse event report from FDA Manufacturer and User Facility Device Experience ("MAUDE") database shows that, as early as 2011, Respironics learned that a patient reported discovering "black dust" on her nose when she awoke the morning after using a RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."

103.     Philips investigated this report, and confirmed the device contained "evidence of an unk[nown] black substance in the air path and on internal components . . . present throughout both the intake and exhaust portions of the air path . . ."[22]

104.     Philips, however, denied that the presence of the black substance was due to a product defect.[23]

105.     Other consumers have also complained about black particles in Philips's devices several years prior to the 2021 recall, as evidenced by forum posts and statements on internet message boards frequented by OSA patients.

106.     In 2018, the user "trickyneedsleep" reported on apneaboard.com that the filters of his DreamStation Auto turned black within three (3) days of use.[24]

107.     In 2019, the user "WSHenry" reported on apneaboard.com in a thread entitled "DreamStation Filter Contamination" that "both the pollen and ultra-fine filters in my machine were clogged with black (Carbon?) particles."[25]  The user further noted that the "water chamber was completely dry.  There were odd odors noted, and the water chamber was undamaged."  He

---

[22] MAUDE Adverse Event Report:  RESPIRONICS, INC. REMSTAR PRO INTERNATIONAL, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi_id=2000987&pc=BZD (last visited Sept. 10, 2021)
[23] *Id*.
[24] Trickyneedsleep, *Dirty filters, APNEA BOARD (Sept. 14, 2018, 5:12 AM)*, *http://www.apneaboard.com/forums/Thread-Dirty-filters*.
[25] WSHenry, *DreamStation Filter Contamination*, APNEA BOARD (July 1, 2019, 11:52 AM), http://www.apneaboard.com/forums/Thread-DreamStation-Filter-Contamination.

explained that he had recently cleaned the filters and that "[t]here was only a small amount of dust on the furniture, and the machine and tubing is clean. I do not burn candles nearby, and the furnace is off. I do have the window slightly opened, as is the case nearly year-round." The user asked: "Is it possible the contamination is from the blower?"

108.    In 2019, the user "Skogcat1" reported on apneaboard.com in a thread entitled "Black sicky dust in CPAP machine: that, when using the REMStar Auto, there were "sticky black dust particles" in the humidifier chamber.[26]

109.    In June 2021, shortly after the recall was announced, on a Reddit thread entitled "Dreamstation Foam," user "BOSSHOG999" posted: "I was wondering what the hell those black particles were in my tube."[27]

110.    Philips, like most companies, monitored message boards, such as apneaboard.com and reddit.com, and social media networks, such as Facebook, and therefore received notice about the potential for PE-PUR foam degradation in the subject devices and black particles in the machines since shortly after launch, if not earlier.

**E.  Plaintiff Developed Chronic Lymphocytic Leukemia/Small Lymphocytic Lymphoma from the Use of Defendants' CPAP Devices.**

111.    Plaintiff began using a CPAP machine for the treatment of OSA in approximately 2010 at the direction of Dr. Brown of Munson Army Health Center in Fort Leavenworth, Kansas, while she was stationed there for her military service, and Plaintiff received and began using the defendants' device in approximately 2014. On or about March 10, 2020, Plaintiff was diagnosed

---

[26] Skogcat1, *Black sticky dust in CPAP machine*, APNEA BOARD (Jan. 22, 2019, 3:33 PM), http://www.apneaboard.com/forums/Thread-Equipment-Black-sticky-dust-in-CPAP-machine
[27] BOSSHOG999, *Dreamstation Foam*, REDDIT, R/CPAP (July 2021) https://www.reddit.com/r/CPAP/comments/o0vncx/dreamstation foam/

with chronic lymphocytic leukemia/small lymphocytic lymphoma at Walter Reed National Military Medical Center, located in Bethesda, Maryland.

112.    Plaintiff's use of the subject devices caused the development and progression of her chronic lymphocytic leukemia/small lymphocytic lymphoma.

113.    Plaintiff's development and progression of her chronic lymphocytic leukemia/small lymphocytic lymphoma, as a result of her use of the subject devices, necessitated treatment resulting in adverse effects, limitations, and sequelae, as well as the need for continuous future medical care and treatment.

114.    Plaintiff's development and progression of her chronic lymphocytic leukemia/small lymphocytic lymphoma, resulting treatment, and need for future medical care and treatment would not have occurred but for the defective nature of the subject devices and Philips's wrongful conduct.

115.    Due to the defective nature of the subject devices and Philips's wrongful conduct, Plaintiff has suffered severe injuries and permanent limitations, has undergone significant treatment, and will be required to undergo significant treatment in the future.

## EQUITABLE TOLLING
## OF STATUTES OF LIMITATIONS

116.    The running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and/or omissions of critical safety information.  Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiff and her physicians the true risks associated with the subject devices.

117.    As a result of Philips's actions, Plaintiff was unaware, and could not have reasonably known or learned through reasonable diligence, that she had been exposed to the risks

and harms set forth and that those risks and harms were the direct and proximate result of Philips's acts and omissions.

## CAUSE OF ACTION

## COUNT I - NEGLIGENCE

118.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

119.    Philips had a duty to individuals, including the Plaintiff, to use reasonable care in designing, researching, manufacturing, marketing, labeling, packaging, supplying, distribution and selling the recalled devices, including the subject devices.

120.    Philips was negligent in failing to use reasonable care as described herein in designing, manufacturing, marketing, labeling, packaging and selling the recalled devices, including the subject devices.  Defendants breached their duty by:

a.    Failing to design the Products so as to avoid unreasonable risk of harm to users, including Plaintiff;

b.    Failing to manufacture the Products so as to avoid an unreasonable risk of harm to users, including Plaintiff;

c.    Failing to use reasonable care in the testing of the Products so as to avoid an unreasonable risk of harm to users, including Plaintiff;

d.    Failing to use reasonable care in inspecting the Products so as to avoid an unreasonable risk of harm to users, including Plaintiff;

e.    Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the recalled devices, including the subject devices.

121.    At the time Philips researched, developed, designed, manufactured, sold, distributed, marketed, and otherwise released the subject devices into the stream of commerce, Phillips knew or should have known that the recalled devices, including the subject devices, presented and unreasonable danger to users when used as intended and in a reasonably anticipated manner.

122.    Specifically, at all relevant times, Philips knew, or should have known, that the recalled devices, including the subject devices, pose a significant health risk in that the PE-PUR sound abatement foam incorporated in the devices may break down and release toxic particles or chemical emissions into a device's air pathway, which a person may ingest or swallow resulting in significant injuries.

123.    At all relevant times, Philips knew, or should have known, that the subject devices created significant risks of serious bodily harm to consumers and Plaintiff, as alleged herein, and Defendants failed to adequately warn reasonably foreseeable users and their health care providers, such as Plaintiff, her physician, and health care providers, of the inherent risks of toxic exposure resulting in significant and life-threatening injuries, such as chronic lymphocytic leukemia/small lymphocytic lymphoma, associated with use of the subject devices.

124.    At all relevant times, Philips had a duty to properly research, develop, design, manufacture, sell, distribute, and market the subject devices, which included providing proper warnings, and taking such steps as necessary to ensure the subject devices did not cause users, like Plaintiff, to suffer from unreasonable and dangerous risks.

125.    Philips, as a researcher, developer, designer, manufacturer, seller, distributor, and marketer of medical devices, is held to the knowledge of an expert in the field, and had a

continuing duty to warn users, including Plaintiff, of the risks associated with using the subject devices.

126.    Philips had a duty to warn Plaintiff and other consumers of the risks of harm resulting from exposure to degraded PE-PUR foam, its particulates and chemical emissions as a result of using the subject devices.

127.    These risks are of such latent nature that health care providers and users could not have recognized the potential harm without proper warnings provided by Philips.

128.    At all relevant times, Philips could have provided proper warnings or instruction regarding the full and complete risks of the subject devices, because Philips knew, or should have known, of the unreasonable risk of harm associated with the use of, or exposure to, the subject devices.

129.    At all relevant times, Philips failed and deliberately refused to investigate, study, test, promote the safety, or minimize the dangers to those who would foreseeably use or be harmed by the subject devices, including Plaintiff.

130.    Plaintiff used and was exposed to the subject devices without knowledge of their dangerous characteristics.

131.    Despite Philips's obligation to unilaterally strengthen the warnings, Philips instead actively concealed knowledge of the true risks concerning use of the subject devices and degradation of the PE-PUR foam incorporated in the devices.

132.    At all relevant times, Plaintiff used or was exposed to the subject devices while using them for their intended or reasonably foreseeable purpose, without knowledge of their dangerous characteristics.

133.    Plaintiff could not have reasonably discovered the defects and risks associated with the subject devices prior to or at the time of using it, and relied upon the skill, superior knowledge, and judgment of Philips to know about and disclose those serious health risks associated with using the subject devices.

134.    Philips knew or should have known that failing to disseminate warnings or instructions regarding the risk of exposure to degraded PE-PUR foam or the dangers of toxic exposure causing severe and life-threatening injuries, such as chronic lymphocytic leukemia/small lymphocytic lymphoma, rendered the subject devices dangerous and unfit for their ordinary, intended, and reasonably foreseeable use.

135.    The information Philips did provide or communicate entirely failed to contain relevant or adequate warnings or precautions that would have enabled consumers, such as Plaintiff, to use the subject devices safely.

136.    Instead, Philips failed to disseminate any information regarding the true and complete risks and otherwise disseminated information that was inaccurate, incomplete, false, and misleading, and which failed to communicate accurately or adequately the risk of injury with use of the subject devices.

137.    In fact, even after April 26, 2021, when Philips first suggested to its shareholders that its PAP devices and ventilators might contain a serious health hazard, it continued to sell those devices, without providing consumers with further or complete warnings, until the date of the eventual recall on June 14, 2021, and during that time, continued to promote its next generation devices that were not subject to the same health hazards.

138.    Philips new or should have known of the unreasonable risks from use of the subject devices, and downplayed or otherwise suppressed any information or research about the risks and dangers of the subject devices.

139.    Philips was able, and in accordance with federal law, to disclose the known risks associated with the subject devices through public service announcements, promotions, advertisements, and other public information sources as it did in its communications to shareholders and ultimately has done since announcing the recall on June 14, 2021.

140.    Philips is liable to Plaintiff for injuries caused by its negligent or willful failure to provide adequate warnings, instructions, or relevant information and data regarding the risks associated with using the subject devices.

141.    Had Philips provided adequate warnings, instructions, or relevant information, and disseminated the risks associated with the subject devices, Plaintiff could have obtained or used alternative devices for the treatment of OSA and avoided the risk of the development and progression of chronic lymphocytic leukemia/small lymphocytic lymphoma.

142.    As a direct and proximate result of Philips placing the defective subject devices onto the stream of commerce, Plaintiff was injured and sustained damages and pecuniary loss in a sum exceeding the jurisdictional minimum of this Court in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages and such other relief as this Court deems just and proper.


## COUNT II - <u>DEFECTIVE DESIGN</u>

143.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

26

144.    The subject devices are inherently dangerous and defective, unfit and unsafe for their intended uses and reasonably foreseeable uses, and do not meet or perform to the expectations of patients and their health care providers.

145.    The design of the subject devices, including, but not limited to, the design incorporating the use of PE-PUR foam and the placement of this foam within the air pathway of the subject devices, was unreasonably dangerous and defective, resulting in the ingestion and inhalation of degraded PE-PUR foam particulates and chemical emissions.

146.    The ingestion and inhalation of this particulate and chemical emissions is known to cause headaches, irritation, inflammation, respiratory issues, and toxic and carcinogenic effects, including the development of chronic lymphocytic leukemia/small lymphocytic lymphoma.

147.    The subject devices used by Plaintiff were defective in design, in that their risk of harm exceeded any claimed benefits.

148.    The subject devices did not perform as an ordinary consumer would expect.

149.    The inherent risks, hazards, and dangers associated with the design of the subject devices, incorporating PE-PUR foam in such a manner that exposes the user, such as Plaintiff, to the ingestion or inhalation of degraded PE-PUR foam particulates or chemical emissions rendered the subject devices unreasonably dangerous.

150.    Accordingly, the design of the subject devices rendered them not reasonably fit, suitable, or safe for their intended purpose.

151.    Neither Plaintiff, nor her physicians or healthcare providers could have, by the exercise of reasonable care, discovered the subject devices' defective conditions or perceived their unreasonable dangers prior to her using the subject devices.

152.    There are other similar CPAP devices that incorporate PE-PUR foam for sound abatement purposes, but do not result in the ingestion or inhalation of toxic foam particulates or chemical emissions.

153.    Furthermore, there are other similar CPAP devices that do not incorporate PE-PUR foam that is subject to degradation or result in exposure to the user of toxic particulates, chemical emissions, or other harmful compounds.

154.    Safer, alternative devices from other manufacturers were available that did not suffer from the defects as set forth herein and that did not have an unreasonable risk of harm as with the subject devices and their unsafe incorporation of PE -PUR foam.

155.    As a result of the foregoing design defects, Philips created risks to the health and safety of its users, including Plaintiff, that were far more significant and devastating than the risks posed by other products and procedures available to treat the corresponding medical conditions, and which far outweigh the utility of the subject devices.

156.    The risk-benefit profile of the subject devices are unreasonable, and they should have had stronger and clearer warnings, or should not have been sold in the market.

157.    Philips intentionally or recklessly designed the subject devices with wanton and willful disregard for the rights and health of Plaintiff and others, and with malice, placing their economic interests above the health and safety of the Plaintiff and others.

158.    As a proximate result of Philips's design of the subject devices, Plaintiff was injured and sustained damages.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, and severally, for compensatory damages and other such relief as this Court deems just and proper.

## COUNT III - <u>BREACH OF EXPRESS AND IMPLIED WARRANTIES</u>

Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

159.    Plaintiff was an individual whom Defendants could reasonably have expected to use, consume, or be affected by Defendants' subject devies within the meaning of Massachusetts General Laws ch. 106 §2-318.

160.    In the design, manufacturing, marketing, distribution and sale of Defendants' subject devices Defendants expressly and impliedly warranted to Plaintiff, her physicians and the general public that the devices were of merchantable quality and reasonably fit and safe for the ordinary purposes for which they were used and that the devices conformed to the standards imposed by law and were safe when used as intended.

161.    Plaintiff, individually and/or by and through her physicians, reasonably relied upon Defendants' express and implies warranties and guarantees that the subject devices were safe, merchantable and reasonably fit for their intended purposes.

162.    Defendants breached these warranties because the subject devices used by Plaintiff were unreasonably dangerous and defective as described herein and not as Defendants had represented.

163.    Defendants' breach of their express and implies warranties resulted in the use of unreasonably dangerous and defective devices by the Plaintiff, placing the Plaintiff's health and safety in jeopardy.

164.    The subject devices defects alleged herein were a substantial contributing cause of the injuries and damages suffered by Plaintiff.

165.    As a result of Defendants' breach of the express and implied warranties, Plaintiff suffered and will continue to suffer injuries, damages, and losses as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and request compensatory damages and such further relief as the Court deems just and proper.

## COUNT IV:  <u>NEGLIGENT MISREPRESENTATION</u>

Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

166.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, and the public, that the subject devices had not been adequately tested and found to be safe and effective for the treatment of OSA. The representations made by Defendants, in fact, were false.

167.    Defendants failed to exercise ordinary care in the representations concerning the subject devices while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the subject devices' high risk of unreasonable, dangerous, adverse side effects.

168.    Defendants breached their duty in representing that use of the Defendants' subject devices had no serious side effects to Plaintiff, Plaintiff's physicians, and the medical and healthcare community.

169.    As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the subject devices had not been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that they created a high risk, and/or higher than acceptable

risk, and/or higher than reported and represented risk, of adverse side effects, including the development of cancer and other severe and personal injuries, which are permanent and lasting in nature.

170.     As a direct and proximate result of the Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants individually, jointly, severally and request compensatory damages and such further relief as the Court deems just and proper.

## COUNT V - <u>LOSS OF CONSORTIUM</u>

171.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

172.     The Plaintiff, James Myers, is, and at all relevant times the husband of Myrna Myers.

173.     As a direct and proximate result of the negligence of the Defendants, James Myers has suffered a diminution of his wife's love, affection, companionship, society and consortium.

WHEREFORE, Plaintiff, James Myers, demands compensatory damages and such other relief the Court deems just and proper.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demands judgment against Defendants jointly and severally for damages to which they are entitled by law, as well as all costs of this action, interest and attorneys' fees, to the full extent of the law, including:

a)    Judgment for Plaintiffs and against Defendants;

b)    Damages to compensate Plaintiff for her injuries, economic losses and pain and suffering;

c)    Compensation for loss of consortium in such amounts as may be proven at trial;

d)    Prejudgment interest at the lawful rate;

e)    Plaintiff's reasonable attorneys' fees; and

f)    For any other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Dated:  March 10, 2022                      Respectfully submitted,


/s/ Marilyn T. McGoldrick
Marilyn T. McGoldrick, Esq.  (BBO# 561766)
**THORNTON LAW FIRM LLP**
One Lincoln St., 13th Fl.
State Street Financial Center
Boston, MA 02111
(617) 720-1333   FAX (617) 720-2445
mmcgoldrick@tenlaw.com